# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THOMAS YERANSIAN, in his capacity as the representative of holders of certain contingent value rights under the Contingent Value Rights Agreement dated October 15, 2010,<br><br>Plaintiff,<br><br>v.<br><br>MARKEL CORPORATION, a Virginia corporation,<br><br>Defendant. | C.A. No. 16-808-GMS<br>(consolidated) |
| MARKEL CORPORATION,<br><br>Plaintiff,<br><br>v.<br><br>THOMAS YERANSIAN, in his capacity as the representative of holders of certain contingent value rights under the Contingent Value Rights Agreement dated October 15, 2010,<br><br>Defendant. | C.A. No. 16-1041-GMS |

## FIRST AMENDED COMPLAINT

**COMES NOW** Plaintiff Thomas Yeransian ("Plaintiff," "Yeransian," or the "Holder Representative"), in his capacity as the representative for holders of certain contingent value rights (hereinafter "CVR Holders") under the Contingent Value Rights Agreement dated October 15, 2010 (the "CVR Agreement"), and for his Amended Complaint against Defendant Markel Corporation ("Markel") states and alleges as follows:

## PARTIES

1. Plaintiff is an individual who, pursuant to the CVR Agreement, has been selected by the Required Holders as the Holder Representative for the CVR Holders. Plaintiff is a resident of the State of Massachusetts.

2. Defendant Markel Insurance is a Virginia corporation with its principal place of business located in Glen Allen, Virginia. The Holder Representative and Markel may collectively be referred to as ("Parties").

## VENUE AND JURISDICTION

3. This Court has subject matter jurisdiction over this action under 15 U.S.C. § 1332 as the amount in controversy exceeds $75,000.00 (excluding interest and costs) and is between citizens of different States.

4. This Court has personal jurisdiction over Defendant pursuant to Section 11.6(b) of the CVR Agreement (more particularly described in Paragraph 8 herein), which provides that "any Delaware court, or Federal Court of the United States of America sitting in Delaware" has exclusive jurisdiction of any action or proceeding arising out of or relating to the CVR Agreement. A dispute has arisen regarding the Parties' rights, duties, and obligations under the CVR Agreement.

## FACTS AND BACKGROUND

### INTRODUCTION

5. The events giving rise to this Complaint began when Markel sought the acquisition of Aspen Holdings, Inc. ("Aspen"), a Delaware Corporation through a merger. At the time of the acquisition, Aspen had employees in the states of Nebraska, Rhode Island, Nevada, California, and Florida and was 100% owner of (1) FirstComp Insurance Company ("FCIC"), an insurance company incorporated and domiciled in Nebraska and regulated by the

Nebraska Department of Insurance (hereafter "FirstComp"); (2) Rex, Inc. ("REX"), a fee-based insurance technology company incorporated in Nebraska; (3) FirstComp Underwriters Group ("FCUG"), a fee-based general insurance agency incorporated in Nebraska; (4) First Comp Insurance Agency, Inc. ("FCIA"), a fee-based general insurance agency incorporated in Delaware; (5) Pinebrook Insurance Group, Inc. ("PIG"), a general insurance agency incorporated in Nebraska; and (6) Banyan Re ("Banyan"), a Bermuda reinsurance company (together herein "Aspen" or the "Company"). Aspen's revenues and profits came from both risk-bearing businesses (FirstComp and Banyan) and commission/fee-based businesses (REX, FCUG, FCIA and PIG). As part of its regular business practice and in accordance with industry standards, Aspen, for its risk-bearing businesses, established loss and expense reserves to pay for claims arising from workers' compensation policies issued and, for its commission/fee-based businesses, established a commission receivable which included loss-sensitive profit sharing commissions relating to MGA[1] contracts with other insurance/reinsurance companies.

6. The policies written by FirstComp were exclusively workers' compensation policies and were written exclusively for low-risk small businesses. FirstComp conducted business in 37 states prior to its acquisition by Markel.

7. Because of the type of businesses insured through FirstComp were exceptionally low risk, the owners of FirstComp as they developed the business had created a model of calculating reserves that was specific to this book of business.

---

[1] Managing General Agency ("MGA") contracts are contracts between a company (such as FCUG) which sells insurance products directly or through independent agents with the insurance company actually taking the risk. The selling company is paid a commission for producing the business and the FCUG MGA contracts included a loss sensitive profit sharing commission component that allowed the commission to increase/decrease depending on the underwriting profit of the insurer taking the risk.

3

8. In 2009, Markel was seeking investment in its business through private equity firms. The investment money would have been used to expand the business of FirstComp and other companies owned by Aspen.

9. In 2009, while representatives of Aspen were entertaining multiple investment offers from private equity firms, Markel approached Aspen about acquiring its businesses through a merger. At this time Aspen was reporting $81.7 million in shareholder's equity (book value).

10. Based upon Aspen's shareholder's equity (book value) of $81.7 million, Markel offered to acquire the Company for $183 million (a 2.3X multiple of book value) subject to due diligence. Markel's proposed acquisition price was consistent with other acquisition proposals received by Aspen.

### FACTS SHOWING FRAUD AND BREACH OF CONTRACT

11. After Aspen and Markel agreed on the acquisition price and general terms of the merger, Markel indicated that it wanted to conduct additional due diligence on the Company's reserves. Following the additional "due diligence," Steve Markel, Vice Chairman of the Board of Directors of Markel, approached Luke Yeransian, CEO of Aspen, and several Aspen managers and stated that Markel believed the shareholder's equity (book value) of Aspen was overstated by $47.3 million as of December 31, 2009. Despite alleging that the shareholder's equity (book value) was overstated, Steve Markel indicated that Markel was still excited about purchasing Aspen for the $183 million purchase price. However, Steve Markel said that he wanted to reduce the cash price to $135.7 million in cash at closing and with the remainder of the price being paid through a Contingent Value Rights ("CVR") Agreement under which $47.3 million in additional consideration would be paid to the shareholders in eight years (with a pre-

4

payment option at year five) if Aspen's shareholder's equity (book value) as of December 31, 2009 was demonstrably correct as stated.

12. The value of the CVRs as proposed by Steve Markel was intended to capture changes in shareholder's equity (book value) and would impact the total consideration ultimately paid to Aspen shareholders. The value of the CVRs would be adjusted upward or downward dollar for dollar prior to payment based on future changes to: (a) Aspen's outstanding loss and expense reserves ("Reserve Adjustment"), (b) the value of Aspen's commission receivable ("Receivable Adjustment") related to its MGA contracts, and (c) other Offsets, including premium audit and any adjustments and/or extraordinary settlements of amounts due to counterparties (reinsurance companies) that would impact book value as stated on December 31, 2009. These Reserve and Receivable Adjustments, which also necessarily include premium audit adjustments, are, collectively with the Offsets, the "Adjustments" to the CVR Principal Amount.

13. In exchange for the Aspen shareholders agreement to accept some of their compensation on a deferred basis, the merger agreement required Markel to meet certain conditions in determining the annual value of the CVRs and advising the shareholders of the financial position of Aspen's former book of business. The conditions on Markel include:

    a. The amounts used to calculate the "Adjusted Principal Amount" from December 31, 2014 through December 31, 2017 will be adjusted in a manner consistent with Actuarial Principles. [CVR Agreement 3.1(c).]

    b. To deliver Annual accountings "together with supporting documentation which demonstrates in reasonable detail how such amounts were determined . . . including a contract-by-contract calculation of LSPS

5

      Commissions under each of the MGA contracts." [CVR Agreement 3.2(a).]

  c. That "actuarial assumptions will incorporate a 50% confidence level" and "reserves will be computed in accordance with commonly accepted actuarial standards consistently applied and fairly stated in accordance with sound actuarial principles." [CVR Agreement Annex A.]

14. Steve Markel represented that if in fact Aspen's shareholder's equity (book value) was higher than the stated value of $81.7 million at December 31, 2009, then Markel would pay to Aspen shareholders the corresponding amount dollar for dollar over the $47.3 million initial CVR value.

15. At the time of the merger, officers of Aspen explained to Markel that because of the low-risk conservative nature of the workers compensation policies written by FirstComp, that the reserves held by FirstComp were more than adequate.

16. In order to induce the Aspen shareholders to agree to the sale with the CVR Agreement making part of the purchase price contingent, Markel and its authorized representatives made the following representations which were false or which omitted material facts:

  a. Aspen's shareholder's equity (book value) was overstated by $47.3 million based upon Markel's analysis.

  b. The shareholders would be paid additional consideration based on the Adjustments to the $47.3 million initial CVR value.

  c. Markel would prudently manage and process claims conservatively and in accordance with sound actuarial and accounting principles.

6

        d.      Markel would provide to the CVR Holders accurate annual reports of the CVR value and Adjustments, together with supporting documentation which demonstrates in reasonable detail how such Adjustment amounts were determined by Markel. The annual reports and supporting documentation would be prepared in a manner consistent with generally accepted accounting principles ("GAAP") and usual and customary actuarial principles as dictated by the CVR Agreement and Actuarial Standards of Practice ("ASOP").

17.     The foregoing assertions were false when made, omitted material facts, and were made with the intent that Aspen rely on the representations in agreeing to allow part of the purchase price to be contingent upon the performance of the businesses Markel acquired through the merger.

18.     Despite having been informed of the unique make up of FirstComp's book of business and the adequacy of the reserves existing at the time of the merger, as soon as Markel took over the FirstComp business, Markel increased the IBNR reserves to an amount greatly exceeding the 50% confidence level.

19.     The amount at which Markel chose to maintain the IBNR reserves were much higher than the industry norm for the type of businesses which were insured.

20.     Even though Markel has provided only limited information to the CVR Holders regarding claim reserves and claim handling practices, it is clear that Markel has not managed Aspen's claims conservatively and prudently as promised, and has therefore failed in its fiduciary responsibilities to the CVR Holders.

21. Markel has misrepresented the dollar amount of incurred but not reported reserves ("IBNR") required to resolve all outstanding Aspen claims and failed and refused to provide accurate accounting information or reports consistent with generally accepted accounting principles (GAAP) and usual and customary actuarial standards of practice (ASOP), including using actuarial assumptions that incorporate a 50% confidence level as required in the CVR Agreement.

22. Markel has reported fraudulent annual results to Plaintiff and CVR Holders that show the CVRs as worthless. The fraudulent reporting has been systematic and continuing since October 15, 2010 and is intended to cause the CVR Holders to believe Markel's representations that the CVRs are worthless.

23. Plaintiff and the other CVR Holders who agreed that the Company could be sold with a substantial deferral of consideration have been damaged by Markel's misrepresentations and actions taken in bad faith and in breach of the Parties' contract.

24. It is foreseeable that had it not been for the representations made by Markel as set out above, the CVR Holders would have invested the funds which remain owed to them and received returns substantially in excess of the interest rate provided for in the CVR Agreement. The CVR Holders, therefore, have suffered consequential damages as a result of Markel's representations and the CVR Holders' reliance upon such representations.

25. If Markel had paid the CVR Holders $47.3 million in the form of Markel stock, the CVR Holders would now have stock worth $130.3 million. Markel Stock has increased by 2.754 times since the acquisition closed. This increase is inconsistent with the alleged returns on Aspen's book of business, providing a reasonable basis for consequential damages to the CVR Holders.

26. Markel and its shareholders have been unduly enriched by utilizing the CVR amount ($47.3 million) to create $130.3 million in value for themselves.

## FACTS REGARDING PURPORTED SETTLEMENT AGREEMENT

27. In mid-2015, the CVR Holders suspected information in Markel's adjustment statement dated December 31, 2014 was false and as a result engaged Huggins Actuarial Services, Inc. ("Huggins"). Huggins was engaged at great expense and time to the CVR Holders to obtain information from Markel, calculate any necessary adjustments, and value the CVRs.

28. After much difficulty obtaining information from Markel, Huggins obtained sufficient information from Markel to calculate a partial value of the CVRs of $28 million. This calculation of the partial value showed the CVRs value was at least $35 million greater than the negative $7 million which Markel represented to the CVR Holders was the value of the CVRs at the end of December, 2015.

29. In late 2015 Markel became aware that the CVR Holders believed that the contract terms of the CVR Agreement had been breached and that the CVR Holders intended to exercise their right to force an independent audit to determine the value of the CVR Agreement pursuant to Section 3.2 of the CVR Agreement.

30. On December 22, 2015, after learning of the CVR Holder's intent to invoke Section 3.2, Markel filed a lawsuit against the previous CVR Holder Representative seeking a declaration that the CVR Holder Representative had failed to make a prepayment election (to receive -$7 million) and was therefore not entitled to resolve disputes under Section 3.2 of the CVR agreement.

31. Markel then used the lawsuit as leverage against the previous CVR Holder Representative and negotiated a "Settlement Agreement" that limited the rights of the CVR Holders by eliminating the right to pre-payment according to the Five-Year Adjustment

Statement.  The Settlement Agreement was signed by the CVR Holder Representative but was not ratified by the CVR Holders contrary to the terms of the CVR Agreement which requires the consent of a percentage of the Holders to any substantive amendment to the CVR Agreement.

32. The so-called Settlement Agreement constitutes an amendment to the CVR Agreement and the previous CVR Holder Representative did not have authority to agree to an amendment of the CVR Agreement.

33. Because the Settlement Agreement was executed contrary to the terms of the CVR Agreement and beyond the authority of the previous CVR Holder Representative, the Settlement Agreement should be unenforceable and void against the CVR Holders.  The CVR Holders are entitled to all of their rights as they existed under the CVR Agreement prior to December 22, 2015.

34. The Settlement Agreement also provides that the CVR Holders cannot take action to trigger the terms of Section 3.2 until after the December 31, 2017 Adjustment Statement is issued.  Markel, therefore, cannot attempt to enforce the provisions of Section 3.2 prior to that time.

## FIRST CAUSE OF ACTION
## BREACH OF CONTRACT

35. The foregoing provisions are incorporated herein by reference.

36. The CVR Agreement requires Markel to follow the generally accepted accounting principles (GAAP) and actuarial standards of practice (ASOP) in making its calculations for reserves.  Furthermore, according to the CVR Agreement, the reserves are to be computed in accordance with commonly accepted actuarial standards at the "50% confidence level."  The limited records which the CVR Holders have been able to obtain suggest that Markel has been setting reserves at a confidence level in excess of 95% despite the terms of the CVR Agreement

and the length of time between Markel's acquisition of Aspen and the current reserve calculations.

37. Section 3.2 (a) of the CVR Agreement specifically required Markel to prepare and deliver, not later than May 1, 2016, a statement setting forth its calculation of the Adjusted Principal Amount as of December 31, 2015, together with supporting documentation demonstrating in reasonable detail how such Adjustment amounts were determined by Markel, including changes in Aspen's loss and expense reserves and a contract-by-contract calculation of LSPS Commissions under each of the MGA Contracts.

38. Pursuant to Section 3.2 (a) of the CVR Agreement, Markel submitted a statement that provides the purported Adjustment and CVR value. However, the statement provided by Markel is woefully inadequate and is not supported by the documentation mandated by Section 3.2 (a).

39. Markel has breached the CVR Agreement and failed to account for the subject reserves in accordance with GAAP and recognized ASOP, including using actuarial assumptions that incorporate a 50% confidence level as required by the CVR Agreement.

40. Markel has breached the CVR Agreement by failing to provide supporting documentation that demonstrates how initial Adjustments were determined for the Adjustment Statement as required by Section 3.2 (a) of the CVR Agreement.

41. Markel has been given a reasonable time to cure such failures and defaults pursuant to Section 9.3 (b) of the CVR Agreement, but as of the date of this Complaint, has failed to remedy the defaults.

42. Pursuant to Section 9.3 (b) of the CVR Agreement, upon the direction of Holders of at least 30% in aggregate of the outstanding CVRs ("Required Holders"), Plaintiff sent Markel

a Notice of Default and Demand for Cure on July 11, 2016 (*see* Exhibit A attached hereto). Within the Notice of Default, Plaintiff included a detailed list of items which would be required by the CVR Holders to verify the value of the CVRs.

43. Markel responded on September 6, 2016 stating that it did not believe a default had been adequately or properly asserted under the CVR Agreement but offered access to a confidential electronic data room ("Data Room") as a means to cure the Notice of Default.

44. On September 9, 2016, Plaintiff was allowed access to the Data Room. Plaintiff engaged in diligent efforts to determine whether or not Markel had cured the breach of contract. After a review of the information in the Data Room, it was abundantly clear that Markel had failed to present all of the information which had been requested by Plaintiff in the Notice of Default.

45. Markel has further breached the CVR Agreement by miscalculating sums due. This breach permits Plaintiff, as designated representative for the CVR Holders, to bring suit to compel appropriate actions by Markel consistent with the CVR Agreement.

46. The CVR Agreement requires that Markel account for reserves at the 50% confidence level according to GAAP principles and ASOP. Pursuant to Section 3.2 (a) of the CVR Agreement, Markel was required to submit supporting documentation that demonstrates how the Final Commissions Received and Receivable, together with other Adjustments, were calculated.

47. Markel has breached the contract by falsifying sums due the CVR Holders; failing to provide required supporting documentation to determine the Adjustments and the CVR value; failing to follow appropriate GAAP accounting and usual and customary actuarial standards, by calculating excessive reserves which are not in accordance with industry standards and practice;

12

and failing to properly report reserves and utilize actuarial assumptions that incorporate a 50% confidence level as required by the CVR Agreement.

48. Markel has further breached the contract by failing to include premium audit in its calculations of the values of the CVR. Failure to account for additional premium received while deducting the full amount of claims makes any ratios inaccurate and fails to properly calculate net gains as well as net losses.

49. Markel was at all relevant times in control of the execution of the conditions in the contract requiring Markel to provide information and perform accounting in a particular manner. Because Markel failed to perform the conditions of disclosure and accounting incorporated into the CVR agreement, Markel has waived its right to assert lack of value of the CVRs as a defense to this suit and must pay to the CVR Holders the sum of $47.3 million regardless of actual value.

50. On September 15, 2016, an Acceleration Notice was sent to Markel pursuant to Section 9.4 of the CVR Agreement stating that the Initial Principal Amount of $47.3 million is due and payable immediately (see Exhibit B).

51. Markel's breach is material, and the Holder Representative therefore is authorized pursuant to the CVR Agreement to declare an Event of Default (as that term is defined in the CVR Agreement) and accelerate all sums due to the CVR Holders.

## SECOND CAUSE OF ACTION
## DECLARATORY JUDGMENT – IMPROPER RESERVES

52. The foregoing provisions are incorporated herein by reference.

53. Markel has asserted that it believes it is acting in accordance with the CVR Agreement.

54. The CVR Holders assert that Markel has failed to follow practices required by law and the CVR Agreement and has failed to provide information necessary to determine whether any Adjustments are warranted to establish the actual value of the CVR.

55. Plaintiff prays for a declaratory judgment that Markel has failed to reserve at the 50% confidence level as required by the CVR and a declaratory judgment that under sound actuarial principles and GAAP, premium audit must be included in the value of the CVRs.

56. Plaintiff also prays for a declaratory judgment that Markel has waived its right to assert that the value of the CVRs is less than $47.3 million.

## THIRD CAUSE OF ACTION
## FRAUDULENT MISREPRESENTATION AND OMISSION

57. The foregoing provisions are incorporated herein by reference.

58. At the time that Markel acquired Aspen, Markel misrepresented or omitted material facts regarding the amount of Aspen's reserves, the way that Markel would manage Aspen's business, the way that Markel would administer claims, and that Markel would accurately report on the state of the business to the CVR Holders as more specifically set out in Paragraphs 8 through 20 of this Complaint and are hereby incorporated by reference.

59. After completing the acquisition of Aspen, Markel has made systematic and continuous fraudulent statements or omissions and misstatements in one or more particulars:

    a. Markel has materially overstated Aspen's estimated reserve requirements and failed to report the actual CVR value that is due and will be due to the CVR Holders.

    b. Markel materially misstated in its declaration of May 2016 the value of the CVR Holders' shares and interests.

    c. Markel provided alleged accounting materials which purport to show that over three months at the end of the first five years of the contract the value of the CVR's fluctuated between $1.5 million and negative $4 million.

60. Markel knows its declarations and accountings to be false and intentionally misleading and has acted with the intent that its declarations be relied upon. The misrepresentation is material and has caused damage and injury to the CVR Holders represented by Plaintiff.

## FOURTH CAUSE OF ACTION
## NEGLIGENT MISREPRESENTATION

61. The foregoing provisions are incorporated herein by reference.

62. Markel knew or should have known that Aspen's reserves and Shareholder's equity (book value) at the time that it acquired the Company were correctly stated, that there was no need for a CVR Agreement, and that it did not intend to manage the Company in accordance with its fiduciary responsibility and conservative practices and industry standards.

63. By entering into the CVR Agreement and representing to the CVR Holders that it would manage Aspen's acquired business in a manner that would allow the CVR Holders to receive future deferred payments, Markel assumed a fiduciary duty to the CVR Holders.

64. Markel knew or should have known that it did not intend to provide sufficient information for the CVR Holders to be able to determine that Markel is not following industry practices with regard to reserves and other accounting and actuarial practices in the insurance industry.

65. Alternatively, Markel's statements were made in reckless disregard of the truth and with the intent that Aspen rely on those representations in agreeing to have part of the purchase price paid out in accordance with the terms established by the CVR Agreement.

66. The recitals of Markel are, at a minimum, a negligent misrepresentation misstating material facts and misstating the value of the CVR Holders' interests.

## FIFTH CAUSE OF ACTION
## ACCOUNTING

67. The foregoing provisions are incorporated herein by reference.

68. Markel has breached the duty owed to the CVR Holders pursuant to the terms of the CVR Agreement and common law.

69. Markel is required to provide a true and complete accounting under GAAP, the CVR Agreement, relevant state law, the Parties' course of dealing, and recognized industry standards and practices.

70. The full extent of the CVR Holders' damages cannot be fully known until Markel provides the CVR Holders with a true and complete accounting for all relevant time periods.

71. Plaintiff prays for a full accounting of the Adjustments, all in accordance with the Demand for Cure shown in Exhibit A, in order to determine the Adjusted Principal Amount of the CVR.

## SIXTH CAUSE OF ACTION
## PUNITIVE/EXEMPLARY DAMAGES

72. The foregoing provisions are incorporated herein by reference.

73. Markel's fraudulent actions, and actions in failing to follow the CVR Agreement, are egregious, in material bad faith, and unconscionable. Markel's conduct is designed to manipulate reserves, falsely state its liabilities (including tax liabilities), and materially misrepresent the rights and payments due to the CVR Holders in order to deprive them of the remainder of the purchase price to which they are entitled.

74. Independent actuaries consulted on this issue have determined that there is, at a minimum, a $35 million differential between the CVR value that Markel has reported to the

CVR Holders and (a) the loss reserves required to resolve all outstanding Aspen claims and (b) the value of the commission receivable related to the Company's MGA contracts which are potential Adjustments to the CVR value.  This sum is expected to materially increase once complete documentation is provided by Markel to thoroughly evaluate all Adjustments which impact the shareholder equity (book value) and therefore the CVR value.

75. This conduct on the part of Markel is reckless, willful, and wanton and warrants an award of punitive damages.

### SEVENTH CAUSE OF ACTION
### DECLARATORY JUDGMENT – SETTLEMENT AGREEMENT
### ON FIVE-YEAR RIGHTS

76. The foregoing provisions are incorporated herein by reference.

77. The CVR Agreement provides that at the five-year anniversary Markel was required to make certain disclosures and, if said disclosures were not made, was at risk for an acceleration of the amounts due to the CVR Holders without Adjustments to the $47.3 million Initial Amount owed to the CVR Holders.

78. Markel, rather than comply with its duty under the contract to make disclosures and provide supporting materials, filed for a declaratory judgment on December 22, 2015 against the previous CVR Holder Representative.  Said suit was brought in bad faith, was groundless, and brought for the sole purpose of creating duress.  The previous CVR Holder Representative was wrongfully induced as a result of this duress to enter into the Settlement Agreement which includes a covenant not to sue on the five-year CVR rights.  This Settlement Agreement is a material amendment to the rights of the CVR holders.

79. The purported amendment required a vote of the CVR Holders, and no such vote and ratification occurred.  The previous CVR Holder Representative resigned shortly thereafter.

80. Plaintiff seeks a declaration that: (a) pursuant to the terms of the CVR Agreement, any material amendment, including without limitation the Settlement Agreement, which includes a purported covenant not to sue requires approval by the CVR Holders; (b) no such approval was obtained or granted; and (c) the Settlement Agreement, including the covenant not to sue, is void.

81. Markel still owes, pursuant to the terms of the CVR Agreement, the disclosure required at the five-year anniversary of the supporting data and documents. Absent such disclosures, Markel is subject to an acceleration of the payment of the $47.3 million without any Adjustments and vesting of the rights of the CVR Holders.

82. Plaintiff seeks a ruling from the Court that the purported Settlement Agreement is not binding, that it is void, and that Markel remains obligated to perform its five-year obligations or suffer the acceleration allowed under the CVR Agreement.

83. Plaintiff seeks an additional ruling that Markel has waived its right to resort to the procedure set forth in Section 3.2 of the CVR Agreement based on its suit against the CVR Holder Representative to stop the use of Section 3.2 and actions taken since that time.

## EIGHTH CAUSE OF ACTION
## BREACH OF FIDUCIARY DUTY

84. The foregoing provisions are incorporated herein by reference.

85. A person or entity managing money or property for another under a specified standard of care is a fiduciary whether the relationship is established by contract or at law.

86. Markel, in representing to the CVR Holders that it would manage Aspen's acquired business in a manner that would allow the CVR Holders to receive future deferred payments, assumed a fiduciary duty.

87. By failing to make the full disclosures to the CVR Holders as required by the CVR Agreement and by acting in such a way that Markel would profit at the expense of the CVR

Holders by retaining funds which should have been paid as deferred compensation to the CVR Holders, Markel breached its fiduciary duty owed to the CVR Holders.

**WHEREFORE**, Plaintiff prays in all of its theories of recovery for:

  A. Monetary damages in an amount to be determined at trial, but not less than $47.3 million or such greater amount as may be reflected by an accurate determination of the Adjustments and value of the CVR Holders' interests;

  B. Monetary damages in the form of an award of exemplary or punitive damages to be determined in relation to the value of Markel as a whole;

  C. A Declaratory Judgment that Markel has failed to properly calculate the reserves;

  D. A Declaratory Judgment that premium audit must be included in valuing the CVR Agreement.

  E. A Declaratory Judgment that the Settlement Agreement which Markel obtained from the former Holder Representative is null and void;

  F. A Declaratory Judgment that Markel has waived its right to rely on Section 3.2 of the CVR Agreement.

  G. An order requiring Markel to immediately furnish the records required by the CVR Agreement consistent with the Demand to Cure to enable the CVR Holders to determine the full extent of the CVR value which they are entitled to receive;

  H. An order that requires Markel to pay for a forensic accountant to work on the behalf of Plaintiff and have full access to Markel books so that actual value of the CVR can be determined;

   I. An order declaring that the CVR amount of $47.3 million plus interest to the CVR Holders is accelerated and due in full and that this suit constitutes any demand or notice required under the CVR Agreement;

   J. An order allowing recovery of costs, recovery of pre- and post-judgment interest, recovery of default interest, recovery of costs of actuarial fees, and recovery of attorneys' fees and expenses as provided by Section ;

   K. An order that establishes a third-party conservator of the outstanding claims to prevent further performance failure of Markel's fiduciary responsibilities to the CVR Holders; and

   L. Such other relief as may be just and equitable under the circumstances.

          Respectfully submitted,

          POTTER ANDERSON & CORROON LLP

OF COUNSEL:

James D. Sherrets
Diana J. Vogt
Robert S. Sherrets
SHERRETS BRUNO & VOGT, LLC
260 Regency Parkway Drive, Suite 200
Omaha, NE 68114
Tel: (402) 390-1112

Dated: June 21, 2017
5195892 / 43609 (cons.)

     By: */s/ Stephanie E. O'Byrne*
       John A. Sensing (#5232)
       Stephanie E. O'Byrne (#4446)
       Hercules Plaza, 6th Floor
       1313 N. Market Street
       Wilmington, DE 19801
       Tel: (302) 984-6000
       jsensing@potteranderson.com
       sobyrne@potteranderson.com

*Attorneys for Thomas Yeransian*