IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF DELAWARE

| | |
|---|---|
| THOMAS YERANSIAN, in his capacity as the representative of holders of certain Contingent Value rights under the Contingent Values Rights Agreement dated October 15, 2010,<br><br>Plaintiff,<br><br>v.<br><br>MARKEL CORPORATION,<br>a Virginia Corporation,<br><br>Defendant. | Civil Action No. 16-808-GMS |

**MEMORANDUM**

## I. INTRODUCTION

Plaintiff Yeransian, in his capacity as the representative of holders of certain contingent value rights under the Contingent Value Rights Agreement, brought this suit against Markel Corporation ("Markel") on September 15, 2016. (D.I. 1). Yeransian alleges that Markel breached the Contingent Value Rights Agreement ("the CVR Agreement") by failing to follow generally accepted accounting principles ("GAAP") and actuarial standard of practice ("ASOP") in its calculations of the Adjusted Principal Amount. *Id.* The Complaint's eight causes of action essentially arise out of Markel's alleged failure to properly calculate the loss and expense reserves, Markel's alleged misrepresentations or misstatements with regard to calculation of those reserves, and Markel's failure to provide the correct documentation for its calculations. *Id.*

Currently before the court is Markel's Motion to Stay Litigation and Compel Arbitration.

(D.I. 35). Markel moves the court to stay the litigation, pending completion of the dispute resolution procedures outline in Section 3.2(d) of the CVR. (D.I. 36). For the reasons that follow, the court grants Markel's motion.

## II. BACKGROUND

The current action arises out of Markel's 2009 acquisition of Aspen Holdings, Inc., a workers' compensation insurance underwriter. (D.I. 1 ¶ 5). In 2009, Aspen reported $81.7 million in shareholder equity (book value). *Id.* ¶ 6. Based on that book value, Markel offered to buy Aspen for $183 million subject to due diligence. *Id.* ¶ 7. After due diligence, Vice Chairman of Markel's Board of Directors informed the CEO of Aspen, Luke Yeransian, that Markel found Aspen's book value to be overstated by $47.3 million as of December 31, 2009. *Id.* ¶ 8. Markel agreed to purchase Aspen but, in order to account for the possibly overstated book value, Markel would pay $135.7 million in cash at closing and create a Contingent Value Rights Agreement. *Id.* The CVR Agreement would pay $47.3 million in additional consideration to Aspen's shareholders in eight years (with a pre-payment option at year five) if Aspen's book value as of December 31, 2009 turned out to be correct. *Id.*

As part of its regular business practice, and important to the company's book value, Aspen "established loss and expense reserves to pay for claims arising from workers' compensation policies." *Id.* ¶ 5. Accordingly, the CVR Agreement was intended to capture changes in Markel's book value—due in part to the reserves—as it affected the compensation ultimately paid to Aspen's shareholders.

> The CVR would be adjusted upward or downward dollar for dollar following the acquisition based on future changes to: (a) Aspen's outstanding loss and expense reserves ("Reserve Adjustment"), (b) the value of Aspen's commission receivable ("Receivable Adjustment") related to its Managing General Agency Contracts, and

2

> (C) other Offsets, including premium audit and any adjustments and/or extraordinary settlements of amounts due to counterparties (reinsurance companies) that would impact book value as stated on December 31, 2009.

*Id.* ¶ 9. If it turned out that Aspen's book value was higher than the stated value of $81.7 at December 31, 2009, then Markel would pay the CVR Holders "the corresponding amount dollar for dollar over the $47.3 million initial CVR value." *Id.* ¶ 11.

To calculate the value of the CVR, and, accordingly, the final payment amount, Markel was to follow the procedures outlined in Section 3.1 of the Agreement. Section 3.1 of the CVR Agreement explains that any prepayment, under Section 3.5(a) or Section 3.5(b), or set-off amounts, under Section 3.4, will be deducted from the Initial Principal Amount. (D.I. 36-2 Section 3.1(a)). Further, the Reserve Adjustment is added to the Receivable Adjustment to determine the Principal Adjustment. *Id.* The Initial Principal Amount adjusted by the Principal Amount then yields the value of the Adjusted Principal Amount. *Id.* The Adjusted Principal Amount, "together with interest accrued thereon at the Interest Rate from the Closing Date to the Payment Date, constitutes the Final Amount. *Id.* § 3.1(b).

Markel was also required to abide by certain obligations under the CVR Agreement: (1) "The amounts used to calculate the 'Adjusted Principal Amount' from December 31, 2014 through December 31, 2017 [had to] be adjusted . . . consistent with Actuarial Principles, (D.I. 36-2 Section 3.1(c)); (2) The Holders had to receive annual accountings, and supporting documentation, demonstrating in reasonable detail how such amounts were determined, *id.* Section 3.2(a); and (3) the actuarial assumptions had to incorporate a 50% confidence interval, and the reserves had to be calculated in accordance with "commonly accepted actuarial standards." *Id.* at Annex A.

3

The CVR Agreement predicted possible disagreements over calculation and valuation of the CVR. In order to resolve such disagreements, the CVR Agreement lays out a detailed process in Section 3.2. According to Section 3.2(d), "[u]pon delivery of a Disagreement Notice, the Holder Representative and Parent [would] attempt in good faith to reach agreement" over the calculation of the Adjusted Principal Amount. In the event that they could not reach agreement within fifteen days of service of the Disagreement Notice, the Holder Representative could request that the calculation of the Adjusted Principal Amount be referred to an "Independent Actuary" and an "Independent Claims Expert."

> The Independent Claims Expert will independently review and evaluate the Net Loss and Expense Reserves with respect to the claims reported as of the Calculations Date on a case-by-case basis and provide the results of his evaluation to the Independent Actuary. The Independent Actuary will then determine the Adjusted Principal Amount based, in the case of Net Loss and Expense Reserves with respect to claims reported as of the Calculation Date, solely on the results of the Independent Claims Expert's review, and otherwise in accordance with GAAP (in the case of the Receivable Adjustment) or SAP (in the case of the Reserve Adjustment) and the Actuarial Principles. The scope of the Independent Actuary's and the Independent Claims Expert's review will be limited to those matters over which there is disagreement between the parties as reflected in the Disagreement Notice. With respect to the review and evaluation of any Adjustment Statement, the Independent Actuary's determination of the Adjusted Principal Amount set forth therein will be final and binding on the parties.

*Id.* Section (d).

The current litigation is not the first time suit has been filed over the CVR Agreement. In 2015, the CVR Holders questioned the validity of the information in Markel's annual Adjustment Statement dated December 31, 2014. (D.I. 1 ¶ 21). The Holders engaged Huggins Actuarial Services, Inc. to calculate any necessary adjustments and the value of the CVRs. *Id.* ¶ 22. Markel, believing that the Holders planned to request an independent valuation, filed suit

4

against the previous CVR Holder Representative. *Id.* ¶ 24. Markel sought declaratory judgment that the previous CVR Holder Representative "had made no prepayment election and was therefore not entitled to an independent audit and a prepayment of the CVR value at year five." *Id.* That prior suit ended in settlement between the parties. The parties executed the 2015 Settlement Agreement, which limited the prepayment rights of the CVR Holders with regard to the Five-Year Adjustment Statement. *Id.* ¶ 25. Inapplicable to the current motion pending before the court, the CVR Holders contest the validity and enforceability of that settlement agreement. *Id.* ¶ 27.

Markel also filed suit in this court alleging that Yeransian breached the 2015 Settlement Agreement, and requesting specific performance of that agreement. Markel also seeks a declaratory judgment that the Settlement Agreement is valid and enforceable. On February 21, 2017, the court issued an oral order consolidating that case with Yeransian's case.

## III. STANDARD OF REVIEW

Because this arbitrability dispute is connected with a transaction involving interstate commerce, the analysis is governed by the Federal Arbitration Act ("FAA"). *Trippe Mfg. Co. v. Niles Audio Corp.*, 401 F.3d 529, 532 (3d Cir. 2005). The FAA provides that written agreements to arbitrate disputes "shall be valid, irrevocable, and enforceable." 9 U.S.C. § 2. Pursuant to the FAA, the court should stay an action and compel arbitration when, in a pending suit, "any issue is referable to arbitration." 9 U.S.C. §§ 3, 4. A district court also has the discretion to dismiss an action if all the issues raised are arbitrable and must be submitted to arbitration. *See BAE Sys. Aircraft Controls, Inc. v. Eclipse Aviation Corp.*, 224 F.R.D. 581, 585 (D. Del. 2004) (collecting cases).

In the Third Circuit, there exists caselaw supporting both the application of a motion-to-dismiss standard and a summary-judgment standard to motions to compel arbitration. *Compare Palcko v. Airborne Express, Inc.*, 372 F.3d 588, 597 (3d Cir. 2004) ("Our prior decisions support the traditional practice of treating a motion to compel arbitration as a motion to dismiss for failure to state a claim upon which relief can be granted."), *with Kaneff v. Delaware Title Loans, Inc.*, 587 F.3d 616, 620 (3d Cir. 2009) ("A district court decides a motion to compel arbitration under the same standard it applies to a motion for summary judgment."). The Third Circuit clarified that motions to compel arbitration are analyzed using the summary judgment standard "if matters beyond the pleadings are considered." *Nationwide Ins. Co. of Columbus, Ohio v. Patterson*, 953 F.2d 44, 45 (3d Cir. 1991). Further, if the complaint is unclear, "or if the plaintiff has responded to a motion to compel arbitration with additional facts sufficient to place the agreement to arbitrate in issue, then 'the parties should be entitled to discovery on the question of arbitrability,'" and a summary judgment standard will be applied to the renewed motions post-discovery. *Guidotti v. Legal Helpers Debt Resolution, L.L.C.*, 716 F.3d 764, 776 (3d Cir. 2013). By contrast, "when it is apparent, based on 'the face of a complaint, and documents relied upon in the complaint,' that certain of a party's claims 'are subject to an enforceable arbitration clause, a motion to compel arbitration should be considered under a Rule 12(b)(6) standard without discovery's delay.'" *Id.*

Before a court can compel arbitration pursuant to the Federal Arbitration Act, 9 U.S.C. §§ 1-16 (2003), the court must determine: (1) whether the parties entered into a valid arbitration agreement, and (2) whether the relevant dispute is arbitrable, meaning that it falls within the language of the arbitration agreement. *See John Hancock Mutual Life Insurance Co. v. Olick,*

151 F.3d 132, 137 (3d Cir. 1998) (stating that where a dispute regarding an arbitration agreement is brought before a district court, the scope of the court's authority to become involved is defined by the FAA). In conducting its review, a court should apply the ordinary state-law principles of contract law. *See* 9 U.S.C. § 2; *First Options of Chicago v. Kaplan*, 514 U.S. 938, 945 (1995) (stating that when considering "whether the parties agreed to arbitrate a certain matter . . . , courts generally . . . should apply ordinary state-law principles that govern formation of contracts"). "[W]here the contract contains an arbitration clause, there is a presumption of arbitrability in the sense that [a]n order to arbitrate the particular grievance should not be denied unless it may be said with positive assurance that the arbitration clause is not susceptible of an interpretation that covers the asserted dispute." *AT & T Techs., Inc. v. Commc'ns Workers of Am.*, 475 U.S. 643, 650 (1986) (internal quotation and citations omitted). Subsequent cases have clarified, however, that while a broad arbitration clause carries a substantial presumption of arbitrability, a narrow clause does not. *See In re FBI Wind Down, Inc.*, 557 B.R. 310, 317 (Bankr. D. Del. 2016), *aff'd*, No. AP 15-51899 (CSS), 2017 WL 2125757 (D. Del. May 16, 2017). When an arbitration clause is construed as narrow, collateral matters are generally not arbitrable. *Id.* (quoting 1 Thomas H. Oehmke, *Commercial Arbitration* § 20:6, Westlaw (May 2017 Update)).

The right to arbitrate is also one that can be waived. The Third Circuit has explained that "prejudice is the touchstone for determining whether the right to arbitrate has been waived." *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 925 (3d Cir. 1992). Consequently, if a party has actively litigated the case—engaging in actions like motions practice and discovery, or assenting to the court's pretrial orders—waiver will likely be found. *See id.*

7

## IV. DISCUSSION

As a preliminary matter, the court will apply the motion to dismiss standard to its consideration of Markel's motion to compel arbitration. This is so because the court only considers the Complaint, its exhibits, and the CVR Agreement—a document intimately associated with the Complaint. *See In re Burlington Coat Factory Sec. Litig.*, 114 F.3d 1410, 1426 (3d Cir. 1997) ("[A] 'document integral to or explicitly relied upon in the complaint' may be considered 'without converting the motion [to dismiss] into one for summary judgment.'") (*citing Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1220 (1st Cir. 1996)). Further, it is apparent from the face of the Complaint that the dispute over value of the CVR and the calculation of the Adjusted Principal Amount are issues subject to an enforceable arbitration clause. Yeransian has not responded to Markel's motion with additional facts sufficient to place the agreement to arbitrate in issue. Thus, the motion to dismiss standard is applicable here.

Yeransian advances three main arguments in support of its contention that litigation should proceed and arbitration is not warranted. First, Yeransian argues that Section 3.2(d) is not a valid agreement to arbitrate. Second, Yeransian avers that the present dispute is not covered by Section 3.2(d). Yeransian contends that Markel either waived its right to invoke arbitration, or, alternatively, Markel should be estopped from doing so. The court will first address Yeransian's estoppel and waiver arguments, and then analyze Yeransian's remaining arguments in turn.

### A. Waiver and Estoppel

Yeransian contends that Markel waived its right to invoke arbitration because it filed suit against the Holder Representative on two occasions, and on neither of those occasions did Markel seek to compel arbitration. Yeransian also argues that, in the event the court declines to

8

find waiver, it should judicially or equitably estop Markel from compelling arbitration. To support that argument, Yeransian claims that it is inconsistent for Markel to now invoke the terms of Section 3.2(d) by its pending motion when, in 2015, it asserted that the Holder Representative failed to meet the conditions necessary to invoke those same terms. (D.I. 39 at 14). The court finds both arguments unpersuasive.

Markel did not waive its right to arbitrate by its 2015 declaratory judgment action or the 2016 action it filed in this court. Those actions deal with separate legal and factual issues; namely, issues regarding whether the Section 3.2(d) valuation process was necessary at year five when "the Holder Representative failed to serve a prepayment election notice," and whether Yeransian breached the 2016 Settlement Agreement, respectively. *See Commercial Arbitration* § 23:6 (Aug. 2016 Update) ("Only prior litigation of the same legal and factual issues as those the party now wants to arbitrate results in waiver of the right to arbitrate."). Further, the court does not find that Yeransian has been prejudiced by Markel's delay in filing its motion. *Hoxworth v. Blinder, Robinson & Co.*, 980 F.2d 912, 925 (3d Cir. 1992). The court, in fact, does not believe that Markel delayed in filing its motion to compel arbitration. The court is aware from prior discussions with the parties that Markel tried to come to an agreement with Yeransian in order to obviate the need for any motion. The court concludes that any delay in filing the motion to compel arbitration was the result of Markel's and Yeransian's attempt to agree to arbitrate.

Yeransian next argues that Markel should be equitably or judicially estopped from compelling arbitration. Judicial estoppel is a judge-made doctrine that serves to "prevent a litigant from asserting a position inconsistent with one that [was] [] previously asserted in the

9

same or in a previous proceeding. *Ryan Operations G.P. v. Santiam-Midwest Lumber Co.*, 81 F.3d 355, 358 (3d Cir. 1996). The doctrine of equitable estoppel is available when: (1) a party misrepresents some fact to another party, and (2) the other party reasonably relies on that misrepresentation, (3) to the other party's detriment. *Leese v. Adelphoi Vill., Inc.*, 516 F. App'x 192, 194 (3d Cir. 2013) (internal citations omitted). The court finds both doctrines inapplicable to the facts of this case.

Yeransian contends that following delivery of the December 31, 2014 Adjustment Statement, the Holder Representative reserved the right to invoke the procedures outlined in Section 3.2(d). (D.I. 39 at 17). According to Yeransian, Markel, instead of following the requirements of Section 3.2(d), filed suit against the Holder Representative, claiming that a prepayment demand was required to be made before Section 3.2(d) could be invoked. *Id.* To settle that suit, the Holder Representative entered into a Settlement Agreement whereby the holders would be barred from utilizing the remedy provided by Section 3.2(d) until after issuance of the December 31, 2017 Adjustment Statement. *Id.* Yeransian argues that Markel now takes the inconsistent position that Section 3.2(d) "is an arbitration clause that requires all disputes between Markel and the CVR Holders to be resolved through the terms set out in Section 3.2(d)." *Id.*

As the court already mentioned, the prior litigation that Markel filed in 2015 was about a separate issue—prepayment of the full balance of the Adjusted Principal Amount set forth in the Five-Year Adjustment Statement when no Prepayment Election Notice was delivered to Markel. Further, Markel has represented that it "has the willingness and ability to deliver a Maturity Date Adjustment Statement at this time," as opposed to waiting until the December 31, 2017 CVR

10

maturity date.[1]  Thus, Markel's current position is not directly at odds with the Settlement

Agreement because that Agreement only barred utilization of 3.2(d)'s dispute resolution process

until after issuance of the Adjustment Statement.

The court recognizes Markel's previous statements that a prepayment demand was

required before Section 3.2(d) could be invoked. Clearly, Markel now claims that a formal

Disagreement Notice is not necessary to institute the dispute resolution procedures of that

section. Regardless, it is within the court's discretion to apply the doctrines of equitable and

judicial estoppel. For the reasons further outlined below, the court does not find persuasive

Yeransian's argument regarding conditions precedent, necessary to trigger the independent

valuation process. Additionally, the court finds the circumstances of the prior litigation over

prepayment to be different enough that the equitable doctrines are inapplicable.

### B. Arbitration Agreement

The court's next task is to determine whether there exists a valid arbitration clause in the

Contingent Value Rights Agreement. Plaintiffs do not argue that Section 3.2(d) of the CVR

Agreement is invalid or that the CVR itself is invalid. Instead, they argue that Section 3.2(d)

cannot be interpreted as an arbitration clause. To decide whether the parties agreed to arbitrate a

certain matter, courts should apply ordinary state-law contract interpretation principles. *First

Options of Chicago, Inc. v. Kaplan*, 514 U.S. 938, 944 (1995). Delaware law instructs the court

---

[1] The court notes—without analyzing—that, had Markel not agreed to furnish the Maturity Date Adjustment Statement, there could have been a ripeness issue. The ripeness doctrine attempts "to prevent courts, through avoidance of premature litigation, from entangling themselves in abstract disagreements." *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967), *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99 (1977). Under that doctrine, the court is tasked with determining whether the issues are fit for judicial decision and the level of hardship caused by withholding court consideration. *Id.* at 149. Because the maturity date contemplated by the contract is in the future—and because the Complaint essentially asks the court to determine the Final Amount in order to award damages—it is at least plausible that the case would not have been ripe if Markel did not accelerate the process.

11

to "give priority to the parties' intentions as reflected in the four corners of the agreement," and to "interpret clear and unambiguous terms according to their ordinary meaning." *GMG Capital Investments, LLC v. Athenian Venture Partners I, L.P.*, 36 A.3d 776, 780 (Del. 2012).

While not a traditional arbitration agreement—in that it never mentions an arbitrator or the term arbitrate—Section 3.2(d) of the CVR is still a contractually agreed upon dispute resolution process by which an Independent Actuary determines the final and binding Adjusted Principal Amount. *See* (D.I. 36-2 Section 3.2(d)) ("With respect to the review and evaluation of any Adjustment Statement, the Independent Actuary's determination of the Adjusted Principal Amount set forth *therein will be final and binding on the parties*.") (emphasis added). Other courts have recognized similar contractual agreements as agreements to arbitrate. *See Seed Holdings, Inc. v. Jiffy Int'l AS*, 5 F. Supp. 3d 565, 576 (S.D.N.Y. 2014) ("While Section 2.8 does not use the term 'arbitration,' it requires the parties to submit their dispute with respect to working capital 'to the binding determination of a third party accounting firm.'"); *AMF Inc. v. Brunswick Corp.*, 621 F. Supp. 456, 460 (E.D.N.Y. 1985) ("No magic words such as 'arbitrate' or 'binding arbitration' or 'final dispute resolution' are needed to obtain the benefits of the [Federal Arbitration] Act."); *McDonnell Douglas Fin. Corp. v. Pennsylvania Power & Light Co.*, 858 F.2d 825, 830 (2d Cir. 1988) (citing with approval cases where submission of disputes to independent appraisers and accountants qualified as arbitrations).

The parties' intentions are clearly and unambiguously laid out in the CVR agreement; an Independent Actuary and an Independent Claims Expert will calculate the Adjusted Principal Amount when the parties fail to reach agreement as to that Amount. (D.I. 36-2 Section 3.2(d)). Plaintiffs take issue with the fact that Section 3.2(d) does not say the Independent Actuary and

12

Claims Expert *will* calculate the Amount, but instead that "the Holder Representative *may* request . . . calculation of the Adjusted Principal Amount" by those experts in the event that the parties fail to reach agreement fifteen days after delivery of the Disagreement Notice. *Id.* (emphasis added). According to Yeransian's argument, disputes over calculations of the Adjusted Principal Amount are only resolved by the Independent Actuary and Claims Expert when the Holder Representative requests such resolution; therefore, they cannot be compelled to undergo the process outlined in Section 3.2(d) against their will. Yeransian further argues that there are a number of conditions precedent that must occur before Section 3.2(d) is triggered. Those conditions include: (1) the end of the December 31, 2017 fiscal year; (2) the issuance of the Maturity Date Adjustment Statement no later than May 1, 2018; (3) Yeransian's delivery of the Disagreement Notice; (4) Yeransian's and Markel's attempt to resolve the dispute; (5) and Yeransian's request for the Independent Valuation procedure in Section 3.2(d). (D.I. 39 at 13). Plaintiff's logic leads inevitably to an impasse—Markel issues the Maturity Date Adjustment Statement, the Parent and the Holder Representative cannot reach an agreement as to the calculation or value of the Adjusted Principle Amount, but, because the Holder Representative refuses to furnish a Disagreement Notice, the disagreement becomes a never-ending story.

By his argument, Yeransian seeks to elevate the procedural aspects of Section 3.2 over the substance of that section. The parties presumably created Section 3.2, and specifically 3.2(d), to resolve disputes over the calculation of the Adjusted Principal Amount, not to create a chicken and egg scenario. Markel represented that is has the "willingness and ability to deliver a Maturity Date Adjustment Statement at this time." (D.I. 36 at 13). Accordingly, the first two "conditions precedent" are now rendered moot. Though there is clear disagreement here over the

13

valuation of that Amount—as evidenced by the commencement of this lawsuit—Yeransian would like the court to believe that Section 3.2(d) is inapplicable because the Holder Representative must take certain discretionary actions, which, at least theoretically, he could decline to take. While the court respects the parties' freedom to contract, Yeransian cannot now claim the protection of certain sections of Section 3.2 that it seeks to undermine by the filing of this suit and its conduct in its prosecution. To vindicate the parties' intentions at the time they entered into the CVR Agreement, it is clear that the court must view Section 3.2(d) as an arbitration clause. Yet, even if the court were to find the other conditions discussed in Yeransian's brief to be "conditions precedent," Yeransian filing this lawsuit satisfies them.

Yeransian's Complaint essentially served the exact same function as the Disagreement Notice contemplated by the CVR agreement—"written notice . . . setting forth in reasonable detail the nature of each of the objections to the calculations." (D.I. 36-2 Section 3.2(c)). Among other things, Yeransian's Complaint objects to the fact that Markel allegedly set reserves at a confidence level in excess of 95%, in violation of GAAP AND ASOP. (D.I. 1 ¶ 29). Such an objection is similar, if not the same, as what would appear in the Disagreement Notice. Further, if the court did not view Yeransian's Complaint as akin to a Disagreement Notice triggering arbitration, Yeransian and the Holders of the Contingent Value Right could skirt their contractual obligations by filing suit in federal court—the very thing arbitration seeks to avoid.

Moreover, the parties have engaged in attempts at mediation since initiation of this action. No doubt such mediation attempts qualify as attempts to resolve disagreements over the calculation of the Adjusted Principal Amount in good faith, as allegedly required before Section 3.2(d) is triggered. As such, Plaintiffs cannot avoid the dispute resolution provisions of Section

14

3.2(d) by filing suit when, in fact, doing so functionally accomplishes the conditions triggering Section 3.2(d).

Yeransian attempts to bolster his argument by citing to procedurally inapplicable, nonbinding caselaw. In *Ferguson v. Lion Holding, Inc.*, 478 F. Supp. 2d 455 (S.D.N.Y. 2007), the court analyzed a section of a Stock Purchase Agreement that laid out the procedure relevant to disputes over the level of reserves carried by the parent company or its subsidiaries. 478 F. Supp. 2d at 477. Though at first glance the facts seem to mirror, at least in part, the current dispute here, the court's analysis was focused on waiver. The plaintiffs in *Ferguson* did not demand independent calculations by third-party experts under the contract at the time they objected to the level of carried reserves. *Id.* Under the contract, however, if the plaintiffs wanted their objection to have any effect on the company's calculation of the carried reserves, they needed to demand a neutral determination at the time they objected—demanding neutral determination was a "condition precedent" to effectuating an objection. *See id.* ("Plaintiffs' right to have a neutral determination of the appropriate level of carried reserves is surely conditional; it only arises after, and 'if,' plaintiffs first disagree with the level of reserves being carried, which consideration it informs defendant of by demand for a neutral determination."). Instead, the plaintiffs demanded independent determination at the summary judgment stage of trial. *Id.* The court found that they could not defeat summary judgment because they waived their right under the contract to request a neutral determination at the relevant time; thus, the company's carried reserve calculations would stand. *Id.* 477–78.

Yeransian uses *Ferguson* to argue that the CVR Agreement contains "condition precedents," which must be satisfied before independent-expert evaluation is triggered. (D.I. 39

15

at 13). The most important among those conditions, according to Yeransian, is: "[I]f the[]
[Holder and Parent] are unable to [reach agreement] within 15 days of receipt of the
Disagreement Notice, then the Holder Representative *may request* that the calculation of the
Adjusted Principal Amount be referred to an actuary . . . and an independent claims expert."
(D.I. 36-2 Section 3.2(d)) (emphasis added). Because the CVR Agreement explains that the
Holders "may request" the calculation of independent experts, according to Yeransian, the court
cannot compel the Holders to submit to the calculation when they have not satisfied that
"condition precedent." (D.I. 39 at 13). *Ferguson* does not support that argument; in fact,
*Ferguson* undermines that point. While the CVR agreement says the Holder "may request"
independent review, the result of the Holders not making such a request is that their
Disagreement Notice is ineffectual. Like in *Ferguson*, the result of failing to request
independent calculation is that Markel's calculations in the Maturity Date Adjustment Statement
stand. If the court were considering a motion for summary judgment here—as the District Court
for the Southern District of New York was in *Ferguson*—and Holders failed to request
independent calculation after disagreeing with the Adjustment Statement's calculations, the court
would find—just as the court did in *Ferguson*—that the Markel's calculations must stand.
Plaintiffs would have waived their right to any other calculation.

 Here, unlike in Ferguson, the relevant time to institute Section 3.2(d)'s procedures is
now. The court is considering Markel's motion to compel arbitration, not a request for summary
judgment. The plaintiffs in *Ferguson* tried to defeat summary judgment by arguing that,
according to the contract, they were entitled to independent review of the company's
calculations, long after the company made those calculations. Here, Yeransian argues that, after

16

Markel's delivery of the Maturity Date Adjustment Statement—a future act—the Holders could technically decide not to request the procedures outlined in Section 3.2(d)—also a future act. Certainly, the contract language explicitly allows for the Holders to decide against requesting calculation by independent experts. But, as previously mentioned, the result of such action is that the Holders are paid out according to Markel's calculations in the Maturity Date Adjustment Statement. As such, regardless of discretionary language in the CVR Agreement, the Holders have two choices after the Maturity Date Adjustment Statement is delivered: elect to undergo the procedures outlined in Section 3.2(d), or live with the calculations in the Adjustment Statement. Yeransian attempts to fashion a third choice by filing suit in this court. The court will not allow such gamesmanship.

Markel plans to deliver the Maturity Date Adjustment Statement now, as opposed to December 31, 2017. It is abundantly clear from the Complaint that Yeransian will disagree with the calculations in that statement, and decline to be bound by them. The parties intended for independent experts, not the court, to resolve such a dispute. Section 3.2(d) has thus been triggered.

### C. Scope of the Arbitration Agreement

Finally, the court must determine whether the current dispute falls within the language of the arbitration agreement. Section 3.2(d) is certainly a narrow arbitration clause in that it lays out a dispute resolution process solely for disagreements regarding valuations of the Adjusted Principal Amount. (D.I. 39-2 Section 3.2(d)).[2] The section further limits the role of the

---

[2] Yeransian contends that "the parties recognized that Section 3.2(d) [was] not the exclusive method to resolve disputes" because Section 8.6(b) of the CVR Agreement references a final determination by a court of competent jurisdiction. (D.I. 36-1 Section 8.6(b)). He further supported that argument by citing to Section 11.6, which grants

17

independent experts by stating that "[t]he scope of the Independent Actuary's and the Independent Claims Expert's review will be limited to those matters over which there is disagreement between the parties." *Id.*; *see United Steelworkers of Am., AFL-CIO-CLC v. Rohm & Haas Co.*, 522 F.3d 324, 331 (3d Cir. 2008) ("Cases holding that the arbitration clauses at issue are narrow have generally relied on language expressly limiting the scope of the clause to specific subject matter."); *Compucom Sys., Inc. v. Getronics Fin. Holdings B.V.*, 635 F. Supp. 2d 371, 378 (D. Del. 2009) (finding that the arbitration clause was narrow because it was limited to the review of whether the "Proposed Purchase Agreement Price Calculation contained mathematical errors"). Even though the arbitration agreement is narrow, the core of the present dispute still falls within its scope.

Yeransian admits that, at least facially, the dispute is over the value of the CVRs. (D.I. 39 at 14). He argues, however, that the core of the dispute is over Markel's failure to maintain reserves at 50% confidence levels, Markel's failure "to follow GAAP and Standard Actuarial Practices in setting the reserves," and Markel's failure "to include [a] premium audit in the net gains/losses." *Id.* Yeransian concludes that, because there are other ancillary issues not directly related to the valuation of the Adjusted Principal Amount, this suit is not properly within the scope of Section 3.2(d). Regardless of whether the nexus of the dispute is the value of the CVRs or Markel's alleged failures, the court cannot determine if Markel's actions or calculations were

---

exclusive jurisdiction to the courts in Delaware. *Id.* Section 11.6(b). Markel does not contend, however, that Section 3.2(d) is an all-encompassing arbitration clause. Instead, as the court recognizes above, it is clear that Section 3.2(d) is a narrow arbitration clause that only submits disagreements regarding valuations of the Adjusted Principal Amount to the independent experts. Section 8.6(b) in no way undermines Section 3.2(d)'s limited arbitration clause because it envisions courts resolving disputes "related to the enforcement of the provisions contained in [the CVR] Agreement or the Merger Agreement." *Id.* Section 8.6(b). Enforcing provisions of the contract is different than calculating the Adjusted Principal Amount in accordance with certain actuarial and accounting principles. Courts routinely undertake one of those tasks, yet are ill-equipped to tackle the other.

18

wrong without knowing what is "right."

The court is not an expert in the fields of accounting or actuarial science. Even our esteemed colleagues at the Bankruptcy Court—who have much more experience dealing with disputes of this type—aknowledge that they are "not [] expert[s] in the principles of any accounting methodology," nor do they "know what the principles of GAAP accounting are." *FBI Wind Down*, 557 B.R. at 323. As the parties clearly acknowledged during formation of the CVR agreement, one way to figure out the correct calculation of the Adjusted Principal Amount is to refer the matter to unbiased experts in the field. Courts routinely do the same thing—defer to the knowledge of experts when considering disputes over the method used for a calculation such as this one. *See id.* at 325 ([i]f the Trustee succeeds in showing that the [Asset Purchase Agreement] requires the use of the Sellers' historical accounting practices, it will be up to the Accounting Arbitrator to determine what the Sellers' historical practices were and whether the Trustee has correctly applies them."); *see also Compucom Sys.,* 635 F. Supp. 2d at 378 (finding that arbitration was "appropriate to resolve disputes over 'the Proposed Purchase Price Calculation,'" because, regardless of the legal theory the parties asserted, "the focal point of the conflict [was] the propriety of using a six-year inventory life"). Yeransian proposes no alternative resolution of the disputes over calculations. Because the parties here do not appear to dispute the methodology required by the CVR—but instead whether Markel correctly applied that methodology—it is up to the independent experts, not the court, to determine whether Markel's calculations are consistent with that required methodology.

Plaintiffs also argue that "[s]imply taking numbers provided by Markel and giving them to an independent third party would not be sufficient for the third party to accurately determine if

19

Markel's calculations included appropriate elements or how Markel's calculations were reached." (D.I. 39 at 14). The court, however, finds no support for that argument in the context of Section 3.2. Section 3.2(d) explains that "[t]he Independent Claims Expert will *independently review and evaluate* the Net Loss and Expense Reserves with respect to the claims reported as of the Calculation Date on a case-by-case basis." (D.I. 36-2 ¶ 3.2(d)). Thereafter, the Independent Actuary determines the Adjusted Principal Amount based "solely on the results of the Independent Claims Expert's review, and otherwise in accordance with GAAP . . . or SAP . . . and the Actuarial Principles." *Id.* The court does not see how the independent expert's analyses relies on numbers provided by Markel. Thus, Yeransian offers no persuasive arguments that the value of the CVR should be determined by the court, as opposed to independent experts, as contemplated by the CVR Agreement.

## V. CONCLUSION

For the foregoing reasons, the court will grant Markel's Motion to Stay Litigation and Compel Arbitration, thereby enforcing Section 3.2(d) of the CVR Agreement.[3]

Dated: July 31, 2017

UNITED STATES DISTRICT JUDGE

---

[3] Despite the stay, the court will retain jurisdiction over any document production disputes that may arise during the independent experts' evaluation. The parties should notify the court of such disputes through the normal discovery dispute procedures.

20